1  **HANNI M. FAKHOURY**
   California Bar No. 252629
2  **FEDERAL DEFENDERS OF SAN DIEGO, INC.**
   225 Broadway, Suite 900
3  San Diego, California  92101-5008
   Telephone:  (619) 234-8467
4  Hanni_Fakhoury@fd.org

5  Attorneys for Mr. Valenzuela-Galindo

6

7

8                  UNITED STATES DISTRICT COURT

9                  SOUTHERN DISTRICT OF CALIFORNIA

10                 **(HONORABLE MARILYN L. HUFF)**

11 UNITED STATES OF AMERICA,          )    CASE NO.: 08CR1274-H
                                      )
12            Plaintiff,              )
                                      )    STATEMENT OF FACTS AND
13 v.                                 )    MEMORANDUM OF POINTS AND
                                      )    AUTHORITIES IN SUPPORT OF MOTIONS
14 **MARIO ENRIQUE VALENZUELA-**       )
   **GALINDO**,                        )
15                                    )
              Defendant.              )
16 _____    )

17                              **I.**

18                    **STATEMENT OF FACTS**

19        On April 23, 2008, a one count indictment was handed down by the January 2007 grand jury

20 charging Mr. Valenzuela-Galindo with attempted entry after deportation, in violation of 8 U.S.C. § 1326.

21                             **II.**

22        **MOTION TO COMPEL DISCOVERY AND PRESERVE EVIDENCE**

23        Mr. Valenzuela-Galindo moves for production of the following discovery.  This request is not limited

24 to those items that the prosecutor knows of, but rather includes all discovery listed below that is in the

25 custody, control, care, or knowledge of any "closely related investigative [or other] agencies."  See

26 United States v. Bryan, 868 F.2d 1032 (9th Cir. 1989). Specifically, Mr. Valenzuela-Galindo moves for the

27 production of the following evidence:

28 //

1. **Mr. Valenzuela-Galindo's Statements.**  Mr. Valenzuela-Galindo requests the government disclose any and all written, recorded and oral statements made by him, as well any written summaries of his oral statements contained in the handwritten notes of any Government agent. Fed. R. Crim. P. 16(a)(1)(A). The Advisory Committee Notes and the 1991 amendments to Rule 16 make clear that the Government must reveal all of Mr. Valenzuela-Galindo's statements, whether written or oral, regardless of whether the Government intends to make any use of those statements. **Mr. Valenzuela-Galindo specifically requests all audio and videotaped copies of his statements and any rough notes taken pertaining to the substance of his statements. Mr. Valenzuela-Galindo requests that the government provide him with a court-certified transcript of the compact disc depicting Mr. Valenzuela-Galindo's post-arrest interrogation by the agents. Furthermore, pursuant to Fed. R. Crim. P. 16(a)(1)(B)(i), Mr. Valenzuela-Galindo requests copies of the audio tapes of any taped telephone call made while he was or is in custody.**

2. **Arrest Reports, Notes and Dispatch Tapes.**  Mr. Valenzuela-Galindo requests the Government to turn over all arrest reports, notes, dispatch or any other tapes and TECS records that relate to the circumstances surrounding his arrest or any questioning.  This request includes, but is not limited to, any rough notes, records, reports, transcripts or other documents in which statements of Mr. Valenzuela-Galindo or any other discoverable material is contained.  Such material is discoverable under Fed. R. Crim. P. 16(a)(1)(A) and Brady v. Maryland, 373 U.S. 83 (1963).  The Government must produce arrest reports, investigator's notes, memos from arresting officers, dispatch tapes, sworn statements, and prosecution reports pertaining to Mr. Valenzuela-Galindo.  See Fed. R. Crim. P. 16(a)(1)(B) and (c), Fed. R. Crim. P. 26.2. **Specifically, Mr. Valenzuela-Galindo requests copies of any Report of Investigation ("ROI") or Record of Deportable/Inadmissible Alien ("I-213") written in his case.**

3. **Mr. Valenzuela-Galindo's "A-File."  Mr. Valenzuela-Galindo requests the Court enter an order giving him the opportunity for his attorney and/or a defense investigator to inspect and copy the entire contents of his immigration "A-File" at a time mutually convenient to both parties. A proposed order will be sent via electronic mail to Chambers as well as to the Assistant United States Attorney.**

//

1    4. **Brady Material**.  Mr. Valenzuela-Galindo requests all documents, statements, agents' reports,

2    and tangible evidence favorable to Mr. Valenzuela-Galindo on the issue of guilt and/or which affects the

3    credibility of the Government's witnesses and the Government's case.  Under Brady, impeachment as well

4    as exculpatory evidence falls within the definition of evidence favorable to the accused.  United States v.

5    Bagley, 473 U.S. 667 (1985); United States v. Agurs, 427 U.S. 97 (1976). Further, Brady requires the

6    government disclose any information that may result in a lower sentence under the sentencing guidelines,

7    notwithstanding its advisory nature, because it is exculpatory and/or mitigating evidence.

8    5. **Mr. Valenzuela-Galindo's Prior Record.**  Mr. Valenzuela-Galindo requests disclosure of his

9    prior criminal record. Fed. R. Crim. P. 16(a)(1)(B).

10    6. **Any Proposed 404(b) Evidence.**  Evidence of prior similar acts is discoverable under Fed. R.

11    Crim. P. 16(a)(1)(c) and Fed. R. Evid. 404(b) and 609.  In addition, under Fed. R. Evid. 404(b), "upon

12    request of the accused, the prosecution . . . shall provide reasonable notice in advance of trial . . . of the

13    general nature . . . ." of any evidence the government proposes to introduce under Fed. R. Evid. 404(b) at

14    trial.  Mr. Valenzuela-Galindo requests the government "articulate precisely the evidential hypothesis by

15    which a fact of consequence may be inferred from the other acts evidence." United States v. Mehrmanesh,

16    689 F.2d 822, 830 (9th Cir. 1982) (emphasis added; internal citations omitted); see also United States v.

17    Brooke, 4 F.3d 1480, 1483 (9th Cir. 1993) (reaffirming Mehrmanesh and reversing convictions). Mr.

18    Valenzuela-Galindo requests **three weeks notice before trial** to give the defense time to adequately

19    investigate and prepare for trial.

20    7. **Evidence Seized.**  Mr. Valenzuela-Galindo requests production of evidence seized as a result of

21    any search, either warrantless or with a warrant. Fed. R. Crim. P. 16(a)(1)(c).

22    8. **Request for Preservation of Evidence.**  Mr. Valenzuela-Galindo specifically requests the

23    preservation of all physical evidence that may be destroyed, lost, or otherwise put out of the possession,

24    custody, or care of the Government and which relates to the arrest or the events leading to the arrest in this

25    case.  This request includes, but is not limited to, the results of any fingerprint analysis, Mr. Valenzuela-

26    Galindo's personal effects, and any evidence seized from Mr. Valenzuela-Galindo.

27    9. **Tangible Objects.**  Mr. Valenzuela-Galindo requests the opportunity to inspect, copy, and test,

28    as necessary, all other documents and tangible objects, including photographs, books, papers, documents,

1  fingerprint analyses, or copies of portions thereof, which are material to the defense, intended for use in the

2  Government's case-in-chief, or were obtained from or belong to Mr. Valenzuela-Galindo. Fed. R. Crim. P.

3  16(a)(1)(c). **Specifically, Mr. Valenzuela-Galindo requests copies of the audio tapes of his alleged prior**

4  **deportations or removals.**

5      10. **Expert Witnesses.** Mr. Valenzuela-Galindo requests the name, qualifications, and a written

6  summary of the testimony of any person that the Government intends to call as an expert witness during its

7  case in chief. Fed. R. Crim. P. 16(a)(1)(E). The defense requests the notice of expert testimony be provided

8  a minimum of two weeks prior to trial so the defense can properly prepare to address and respond to this

9  testimony, including obtaining its own expert and/or investigating the opinions, credentials of the

10  Government's expert and a hearing in advance of trial to determine the admissibility of qualifications of any

11  expert. See Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 152 (1999) (trial judge is "gatekeeper" and

12  must determine, reliability and relevancy of expert testimony and such determinations may require "special

13  briefing or other proceedings").

14      11. **Scientific and Other Information.** Mr. Valenzuela-Galindo requests the results of any

15  scientific or other tests or examinations conducted by any Government agency or their subcontractors in

16  connection with this case. See Fed. R. Crim. P. 16(a)(1)(D).

17      12. *Henthorn* **Material.** Mr. Valenzuela-Galindo requests that the Assistant United States Attorney

18  ("AUSA") assigned to this case oversee (not personally conduct) a review of all personnel files of each agent

19  involved in the present case for impeachment material. See Kyles v. Whitley, 514 U.S. 419 (1995) (holding

20  that "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on

21  the Government's behalf in the case, including the police"); United States v. Henthorn, 931 F.2d 29 (9th Cir.

22  1991); United States v. Jennings, 960 F.2d 1488 (9th Cir. 1992) (AUSA may not be ordered to personally

23  conduct examination of records; appropriate Government agency may review files and notify AUSA of

24  contents as long as AUSA makes the determination regarding material to be disclosed); United States v.

25  Herring, 83 F.3d 1120 (9th Cir. 1996) (accord).

26      13. **Evidence of Bias or Motive to Lie.** Mr. Valenzuela-Galindo requests any evidence that any

27  prospective Government witness is biased or prejudiced against Mr. Valenzuela-Galindo, or has a motive

28  to falsify or distort his or her testimony.

14. **Impeachment Evidence.** Mr. Valenzuela-Galindo requests any evidence that any prospective Government witness has engaged in any criminal act whether or not resulting in a conviction and whether any witness has made a statement favorable to Mr. Valenzuela-Galindo. <u>See</u> Fed. R. Evid. 608, 609 and 613; <u>Brady v. Maryland</u>, 373 U.S. 83 (1963).

15. **Evidence of Criminal Investigation of Any Government Witness.** Mr. Valenzuela-Galindo requests any evidence that any prospective witness is under investigation by federal, state or local authorities for any criminal conduct.

16. **Evidence Affecting Perception, Recollection, Ability to Communicate, or Truth Telling.** Mr. Valenzuela-Galindo requests any evidence, including any medical or psychiatric report or evaluation, that tends to show that any prospective witness' ability to perceive, remember, communicate, or tell the truth is impaired, and any evidence that a witness has ever used narcotics or other controlled substances, or has ever been an alcoholic.

17. **Witness Addresses.** Mr. Valenzuela-Galindo requests the name and last known address of each prospective Government witness. Mr. Valenzuela-Galindo also requests the name and last known address of every witness to the crime or crimes charged (or any of the overt acts committed in furtherance thereof) who will not be called as a Government witness.

18. **Name of Witnesses Favorable to Mr. Valenzuela-Galindo.** Mr. Valenzuela-Galindo requests the name of any witness who made an arguably favorable statement concerning Mr. Valenzuela-Galindo or who could not identify him or who was unsure of his identity, or participation in the crime charged.

19. **Statements Relevant to the Defense.** Mr. Valenzuela-Galindo requests disclosure of any statement relevant to any possible defense or contention that he might assert in his defense.

20. **Giglio Information & Agreements Between the Government and Witnesses.** Pursuant to <u>Giglio v. United States</u>, 405 U.S. 150 (1972), Mr. Valenzuela-Galindo requests all statements and/or promises, express or implied, made to any witness, in exchange for their testimony in this case, and all other information which could be used for impeachment. Mr. Valenzuela-Galindo also requests discovery regarding any other express or implicit promise, understanding, offer of immunity, of past, present, or future compensation, or any other kind of agreement, promise, or understanding, including any implicit understanding relating to criminal or civil income tax, forfeiture or fine liability, between any prospective

Government witness and the Government (federal, state and/or local). This request also includes any discussion with a potential witness about or advice concerning any contemplated prosecution, or any possible plea bargain, even if no bargain was made, or the advice not followed, and specifically includes any discussion with a potential witness regarding that witness' immigration status and/or any affect that the witness' statements or lack thereof might have on that status, including the granting or revoking of such immigration status or any other immigration status, including but not limited to citizenship, nationality, a green card, border crossing card, parole letter, or permission to remain in the United States.

21. **Informants and Cooperating Witnesses.** Mr. Valenzuela-Galindo requests disclosure of the names and addresses of all informants or cooperating witnesses used or to be used in this case, and in particular, disclosure of any informant who was a percipient witness in this case or otherwise participated in the crime charged against Mr. Valenzuela-Galindo. The Government must disclose the informant's identity and location, as well as the existence of any other percipient witness unknown or unknowable to the defense. Roviaro v. United States, 353 U.S. 53, 61-62 (1957). The Government must disclose any information derived from informants which exculpates or tends to exculpate Mr. Valenzuela-Galindo. Brady v. Maryland, 373 U.S. 83 (1963)

22. **Bias by Informants or Cooperating Witnesses.** Mr. Valenzuela-Galindo requests disclosure of any information indicating bias on the part of any informant or cooperating witness. Giglio v. United States, 405 U.S. 150 (1972). Such information includes, but is not limited to, any inducements, favors, payments or threats that were made to the witness in order to secure cooperation with the authorities.

23. **Jencks Act Material.** Mr. Valenzuela-Galindo requests production in advance of trial of all material, including dispatch tapes, which the Government must produce pursuant to the Jencks Act, 18 U.S.C. § 3500. Advance production will avoid the possibility of delay at trial to allow Mr. Valenzuela-Galindo to investigate the Jencks material. A verbal acknowledgment that "rough" notes constitute an accurate account of the witness' interview is sufficient for the report or notes to qualify as a statement under § 3500(e)(1). Campbell v. United States, 373 U.S. 487, 490-92 (1963); see United States v. Boshell, 952 F.2d 1101 (9th Cir. 1991) (agent's interview notes reviewed with interviewee subject to Jencks Act).

24. **Residual Request.** Mr. Valenzuela-Galindo intends by this discovery motion to invoke his rights to discovery to the fullest extent possible under the Federal Rules of Criminal Procedure and the

Constitution and laws of the United States.  Mr. Valenzuela-Galindo requests that the Government provide

him and his attorney with the above requested material sufficiently in advance of trial to avoid unnecessary

delay prior to cross-examination.

**II.**

**THE INDICTMENT SHOULD BE DISMISSED BECAUSE JUDGE BURNS'S
INSTRUCTIONS AS A WHOLE PROVIDED TO THE JANUARY 2007 GRAND JURY RUN
AFOUL OF BOTH NAVARRO-VARGAS AND WILLIAMS AND VIOLATE THE FIFTH
AMENDMENT BY DEPRIVING MR. VALENZUELA-GALINDO OF THE TRADITIONAL
FUNCTIONING OF THE GRAND JURY**

**A.    Introduction.**

The indictment in the instant case was returned by the January 2007 grand jury.  See CR at 6.[1]  That

grand jury was instructed by Judge Burns on January 11, 2007.  See Reporter's Partial Transcript of the

Proceedings, dated January 11, 2007, a copy of which is attached hereto as Exhibit A.  Judge Burns's

instructions to the impaneled grand jury deviate from the instructions at issue in the major Ninth Circuit

cases challenging a form grand jury instruction previously given in this district in several ways.[2]  These

instructions compounded Judge Burns's erroneous instructions and comments to prospective grand jurors

during voir dire of the grand jury panel, which immediately preceded the instructions at Ex. A.  See

Reporter's Transcript of Proceedings, dated January 11, 2007, a copy of which is attached hereto as Exhibit

B.[3]

//

//

//

//

---

[1] "CR" refers to the Clerk's Record in Case Number 07CR2364-LAB.

[2] See, e.g., United States v. Cortez-Rivera, 454 F.3d 1038 (9th Cir. 2006); United States v. Navarro-Vargas, 408 F.3d 1184 (9th Cir.) (en banc), cert. denied, 126 S. Ct. 736 (2005) (Navarro-Vargas II); United States v. Navarro-Vargas, 367 F.3d 896 (9th Cir. 2004)(Navarro-Vargas I); United States v. Marcucci, 299 F.3d 1156 (9th Cir. 2002) (per curiam).

[3] The transcript of the voir dire indicates that grand jurors were shown a video presentation on the role of the grand jury.  Mr. Valenzuela-Galindo requests that the video presentation be produced.  See United States v. Alter, 482 F.2d 1016, 1029 n.21 (9th Cir. 1973) ("[t]he proceedings before the grand jury are secret, but the ground rules by which the grand jury conducts those proceedings are not.").

1.    **Judge Burns Instructed Grand Jurors That Their Singular Duty Is to Determine Whether or Not Probable Cause Exists and That They Have No Right to Decline to Indict When the Probable Cause Standard Is Satisfied.**

After repeatedly emphasizing to the grand jurors that probable cause determination was their sole responsibility, see Ex. A at 3, 3-4, 5,[4] Judge Burns instructed the grand jurors that they were forbidden "from judg[ing] the wisdom of the criminal laws enacted by Congress; that is, whether or not there should be a federal law or should not be a federal law designating certain activity [as] criminal is not up to you." See id. at 8. The instructions go beyond that, however, and tell the grand jurors that, should "you disagree with that judgment made by Congress, then your option is not to say 'well, I'm going to vote against indicting even though I think that the evidence is sufficient' or 'I'm going to vote in favor of even though the evidence may be insufficient.'" See id. at 8-9. Thus, the instruction flatly bars the grand jury from declining to indict because the grand jurors disagree with a proposed prosecution.

Immediately before limiting the grand jurors' powers in the way just described, Judge Burns referred to an instance in the grand juror selection process in which it excused three potential jurors. See id. at 8.

> I've gone over this with a couple of people. You understood from the questions and answers that a couple of people were excused, I think three in this case, because they could not adhere to the principle that I'm about to tell you.

Id. That "principle" was Judge Burns's discussion of the grand jurors' inability to give effect to their disagreement with Congress. See id. at 8-9. Thus, the Court not only instructed the grand jurors on its view of their discretion; it enforced that view on pain of being excused from service as a grand juror.

Examination of the recently disclosed voir dire transcript, which contains additional instructions and commentary in the form of the give and take between Judge Burns and various prospective grand jurors, reveals how Judge Burns's emphasis of the singular duty is to determine whether or not probable cause exists and his statement that grand jurors they cannot judge the wisdom of the criminal laws enacted by Congress merely compounded an erroneous series of instructions already given to the grand jury venire. In one of his earliest substantive remarks, Judge Burns makes clear that the grand jury's sole function is probable cause determination.

//

_____

[4] See also id. at 20 ("You're all about probable cause.").

[T]he grand jury is determining really two factors: "do we have a reasonable belief that a crime was committed? And second, do we have a reasonable belief that the person that they propose that we indict committed the crime?"

If the answer is "yes" to both of those, then the case should move forward. If the answer to either of the questions is "no," then the grand jury should not hesitate and not indict.

See Ex. B at 8. In this passage, Judge Burns twice uses the term "should" in a context makes clear that the term is employed to convey instruction: "should" cannot reasonably be read to mean optional when it addresses the obligation not to indict when the grand jury has no "reasonable belief that a crime was committed" or if it has no "reasonable belief that the person that they propose that we indict committed the crime."

Equally revealing is Judge Burns's interactions with two potential grand jurors who indicated that, in some unknown set of circumstances, they might decline to indict even where there was probable cause. Because of the redactions of the grand jurors' names, Mr. Valenzuela-Galindo will refer to them by occupation. One is a retired clinical social worker (hereinafter CSW), and the other is a real estate agent (hereinafter REA). The CSW indicated a view that no drugs should be considered illegal and that some drug prosecutions were not an effective use of resources. See id. at 16. The CSW was also troubled by certain unspecified immigration cases. See id.

Judge Burns made no effort to determine what sorts of drug and immigration cases troubled the CSW. He never inquired as to whether the CSW was at all troubled by the sorts of cases actually filed in this district, such as drug smuggling cases and cases involving reentry after deportation and alien smuggling. Rather, Judge Burns provided instructions suggesting that, in any event, any scruples CSW may have possessed were simply not capable of expression in the context of grand jury service.

Now, the question is can you fairly evaluate [drug cases and immigration cases]? Just as the defendant is ultimately entitled to a fair trial and the person that's accused is entitled to a fair appraisal of the evidence of the case that's in front of you, so, too, is the United States entitled to a fair judgment. If there's probable cause, then the case should go forward. *I wouldn't want you to say*, "well, yeah, there's probable cause, but I still don't like what our government is doing. I disagree with these laws, so I'm not going to vote for it to go forward." If that is your frame of mind, the probably you shouldn't serve. Only you can tell me that.

See id. at 16-17 (emphasis added). Thus, without any sort of context whatsoever, Judge Burns let the grand juror know that it would not want him or her to decline to indict in an individual case where the grand juror

1    "[didn't] like what our government is doing," see id. at 17, but in which there was probable cause. See Id.

2    Such a case "should go forward." See id. Given that blanket proscription on grand juror discretion, made

3    manifest by Judge Burns's use of the pronoun "I", the CSW indicated that it "would be difficult to support

4    a charge even if [the CSW] thought the evidence warranted it." See id. Again, Judge Burns's question

5    provided no context; it inquired regarding "a case," a term presumably just as applicable to possession of

6    a small amount of medical marijuana as kilogram quantities of methamphetamine for distribution. Any

7    grand juror listening to this exchange could only conclude that there was *no* case in which Judge Burns

8    would permit them to vote "no bill" in the face of a showing probable cause.

9         Just in case there may have been a grand juror that did not understand his or her inability to exercise

10   anything like prosecutorial discretion, Judge Burns drove the point home in his exchange with REA. REA

11   first advised Judge Burns of a concern regarding the "disparity between state and federal law" regarding

12   "medical marijuana." See id. at 24. Judge Burns first sought to address REA's concerns about medical

13   marijuana by stating that grand jurors, like trial jurors, are simply forbidden from taking penalty

14   considerations into account.

15        Well, those things -- the consequences of your determination shouldn't concern you in the
16        sense that penalties or punishment, things like that -- we tell trial jurors, of course, that
          they cannot consider the punishment or the consequence that Congress has set for these
17        things. We'd ask you to also abide by that. We want you to make a business-like
          decision of whether there was a probable cause. . . .

18   Id. at 24-25. Having stated that REA was to "abide" by the instruction given to trial jurors, Judge Burns

19   went on to suggest that REA recuse him or herself from medical marijuana cases. See id. at 25.

20        In response to further questioning, REA disclosed REA's belief "that drugs should be legal." See id.

21   That disclosure prompted Judge Burns to begin a discussion that ultimately led to an instruction that a grand

22   juror is obligated to vote to indict if there is probable cause.

23        I can tell you sometimes I don't agree with some of the legal decisions that are indicated that
24        I have to make. But my alternative is to vote for someone different, vote for someone that
          supports the policies I support and get the law changed. It's not for me to say, "well, I don't
25        like it. So I'm not going to follow it here."

26        You'd have a similar obligation as a grand juror even though you might have to grit your
          teeth on some cases. Philosophically, if you were a member of congress, you'd vote against,
27        for example, criminalizing marijuana. I don't know if that's it, but you'd vote against
          criminalizing some drugs.

28   //

That's not what your prerogative is here. You're prerogative instead is to act like a judge and say, "all right. This is what I've to deal with objectively. Does it seem to me that a crime was committed? Yes. Does it seem to me that this person's involved? It does." *And then your obligation, if you find those to be true, would be to vote in favor of the case going forward.*

Id. at 26-27 (emphasis added). Thus, the grand juror's duty is to conduct a simple two part test, which, if both questions are answered in the affirmative, lead to an "obligation" to indict.

Having set forth the duty to indict, and being advised that REA was "uncomfortable" with that paradigm, Judge Burns then set about to ensure that there was no chance of a deviation from the obligation to indict in every case in which there was probable cause.

The Court: Do you think you'd be inclined to let people go in drug cases even though you were convinced there was probable cause they committed a drug offense?
REA: It would depend on the case.
The Court: Is there a chance that you would do that?
REA: Yes.
The Court: I appreciate your answers. I'll excuse you at this time.

Id. at 27. Two aspects of this exchange are crucial. First, REA plainly does not intend to act solely on his political belief in decriminalization -- whether he or she would indict "depend[s] on the case," see id., as it should. Because REA's vote "depend[s] on the case," see id., it is necessarily true that REA would vote to indict in some (perhaps many or even nearly all) cases in which there was probable cause. Again, Judge Burns made no effort to explore REA's views; it did not ascertain what sorts of cases would prompt REA to hesitate. The message is clear: it does not matter what type of case might prompt REA's reluctance to indict because, once the two part test is satisfied, the "obligation" is "to vote in favor of the case going forward."[5] See id. at 27. That is why even the "chance," see id., that a grand juror might not vote to indict was too great a risk to run.

//

//

---

[5] This point is underscored by Judge Burns's explanation to the Grand Jury that a magistrate judge will have determined the existence of probable cause "in most circumstances" before it has been presented with any evidence. See Ex. A at 6. This instruction created an imprimatur of finding probable cause in each case because had a magistrate judge not so found, the case likely would not have been presented to the Grand Jury for indictment at all. The Grand Jury was informed that it merely was redundant to the magistrate court "in most circumstances." See id. This instruction made the grand jury more inclined to indict irrespective of the evidence presented.

08CR01274-H

**2. The Instructions Posit a Non-Existent Prosecutorial Duty to Offer Exculpatory Evidence.**

In addition to his instructions on the authority to choose not to indict, Judge Burns also assured the grand jurors that prosecutors would present to them evidence that tended to undercut probable cause.  See Ex. A at 20.[6]

> Now, again, this emphasizes the difference between the function of the grand jury and the trial jury.  You're all about probable cause.  If you think that there's evidence out there that might cause you to say "well, I don't think probable cause exists," then it's incumbent upon you to hear that evidence as well.  As I told you, in most instances, *the U.S. Attorneys are duty-bound to present evidence that cuts against what they may be asking you to do if they're aware of that evidence*.

Id. (emphasis added).

The antecedent to this instruction is also found in the voir dire.  After advising the grand jurors that "the presentation of evidence to the grand jury is necessarily one-sided," see Ex. B at 14, Judge Burns gratuitously added that "[his] experience is that the prosecutors don't play hide-the-ball. If there's something

_____

[6] These instructions were provided in the midst of several comments that praised the United States attorney's office and prosecutors in general. Judge Burns advised the grand jurors that they "can expect that the U.S. Attorneys that will appear in from of [them] will be candid, they'll be honest, and . . . they'll act in good faith in all matters presented to you." See Ex. A at 27.  The instructions delivered during voir dire go even further.  In addressing a prospective grand juror who revealed "a strong bias for the U.S. Attorney, whatever cases they might bring," see Ex. B at 38, Judge Burns affirmatively endorsed the prospective juror's view of the U.S. Attorney's office, even while purporting to discourage it: "frankly, I agree with the things you are saying.  They make sense to me." See id. at 43. See also id. at 40 ("You were saying that you give a presumption of good faith to the U.S. Attorney and assume, quite logically, that they're not about the business of trying to indict innocent people or people that they believe to be innocent or the evidence doesn't substantiate the charges against.").

Judge Burns's discussion of his once having been a prosecutor before the Grand Jury compounded the error inherent in his praising of the government attorneys. See Ex. A at 9-10. Judge Burns's instructions implied that as a prior prosecutor and current "jury liaison judge," see id. at 8, Judge Burns would not allow the government attorneys to act inappropriately or to present cases for indictment where no probable cause existed.

In addition, while Judge Burns instructed the Grand Jury that it had the power to question witnesses, Judge Burns's instructions also told the Grand Jury that it should "be deferential to the U.S. Attorney if there is an instance where the U.S. Attorney thinks a question ought not to be asked." See Ex. A at 12.  As the dissent in Navarro-Vargas pointed out, "the grand jury's independence is diluted by [such an] instruction, which encourages deference to prosecutors." Navarro-Vargas, 408 F.3d at 1215.  The judge's admonition that his statement was only "advice," see Ex A at 12, does not cure the error as courts regularly presume grand jurors follow instructions provided to them by the court. See id. at 1202, n.23 ("We must presume that grand jurors will follow instructions because, in fact, we are prohibited from examining jurors to verify whether they understood the instruction as given and then followed it.").

08CR01274-H

1  adverse or that cuts against the charge, you'll be informed of that.  They have a duty to do that."  See id.

2  Thus, Judge Burns unequivocally advised the grand jurors that the government would present any evidence

3  that was "adverse" or "that cuts against the charge."  See id.

4  **B.    Navarro-Vargas Establishes Limits on the Ability of Judges to Constrain the Powers of the Grand Jury, Which Judge Burns Far Exceeded in His Instructions as a Whole During Impanelment.**

5

6          The Ninth Circuit has, over vigorous dissents, rejected challenges to various instructions given to

7  grand jurors in the Southern District of California.  See Navarro-Vargas II, 408 F.3d 1184.  While the Ninth

8  Circuit has thus far (narrowly) rejected such challenges, it has, in the course of adopting a highly formalistic

9  approach[7] to the problems posed by the instructions, endorsed many of the substantive arguments raised by

10  the defendants in those cases.  The district court's instructions cannot be reconciled with the role of the

11  grand jury as set forth in Navarro-Vargas II.  Taken together, the voir dire of and instructions given to the

12  January 2007 Grand Jury, go far beyond those at issue in Navarro-Vargas, taking a giant leap in the direction

13  of a bureaucratic, deferential grand jury, focused solely upon probable cause determinations and utterly

14  unable to exercise any quasi-prosecutorial discretion.  That is not the institution the Framers envisioned.

15  See United States v. Williams, 504 U.S. 36, 49 (1992).

16          For instance, with respect to the grand jury's relationship with the prosecution, the Navarro-Vargas

17  II majority acknowledges that the two institutions perform similar functions: "'the public prosecutor, in

18  deciding whether a particular prosecution shall be instituted or followed up, performs much the same

19  function as a grand jury.'"  Navarro-Vargas II, 408 F.3d at 1200 (quoting Butz v. Economou, 438 U.S. 478,

20  510 (1978)).  Accord United States v. Navarro-Vargas, 367 F.3d 896, 900 (9th Cir. 2004) (Navarro-Vargas

21  I)(Kozinski, J., dissenting) (The grand jury's discretion in this regard "is most accurately described as

22  prosecutorial." ).  See also Navarro-Vargas II, 408 F.3d at 1213 (Hawkins, J., dissenting).  It recognizes that

23  the prosecutor is not obligated to proceed on any indictment or presentment returned by a grand jury, id.,

24  but also that "the grand jury has no obligation to prepare a presentment or to return an indictment drafted

25

26

27          [7] See Navarro-Vargas II, 408 F.3d at 1210-11 (Hawkins, J., dissenting) (criticizing the majority because "[t]he instruction's use of the word 'should' is most likely to be understood as imposing an inflexible 'duty or obligation' on grand jurors, and thus to circumscribe the grand jury's constitutional independence.").

28

by the prosecutor." Id.  See Niki Kuckes, The Democratic Prosecutor:  Explaining the Constitutional Function of the Federal Grand Jury, 94 Geo. L.J. 1265, 1302 (2006) (the grand jury's discretion not to indict was "'arguably . . . the most important attribute of grand jury review from the perspective of those who insisted that a grand jury clause be included in the Bill of Rights'") (quoting Wayne LaFave et al., Criminal Procedure § 15.2(g) (2d ed. 1999)).

Indeed, the Navarro-Vargas II majority agrees that the grand jury possesses all the attributes set forth in Vasquez v. Hillery, 474 U.S. 254 (1986).  See id.

> The grand jury thus determines not only whether probable cause exists, but also whether to "charge a greater offense or a lesser offense; numerous counts or a single count; and perhaps most significant of all, a capital offense or a non-capital offense -- all on the basis of the same facts.  And, significantly, the grand jury may refuse to return an indictment even "'where a conviction can be obtained.'"

Id. (quoting Vasquez, 474 U.S. at 263).  The Supreme Court has itself reaffirmed Vasquez's description of the grand jury's attributes in Campbell v. Louisiana, 523 U.S. 392 (1998), noting that the grand jury "controls not only the initial decision to indict, but also significant questions such as how many counts to charge and whether to charge a greater or lesser offense, including the important decision whether to charge a capital crime." Id. at 399 (citing Vasquez, 474 U.S. at 263).  Judge Hawkins notes that the Navarro-Vargas II majority accepts the major premise of Vasquez: "the majority agrees that a grand jury has the power to refuse to indict someone even when the prosecutor has established probable cause that this individual has committed a crime." See id. at 1214 (Hawkins, J. dissenting).  Accord Navarro-Vargas I, 367 F.3d at 899 (Kozinski, J., dissenting); United States v. Marcucci, 299 F.3d 1156, 1166-73 (9th Cir. 2002) (per curiam) (Hawkins, J., dissenting).  In short, the grand jurors' prerogative not to indict enjoys strong support in the Ninth Circuit.  But not in Judge Burns's instructions.

**C.    Judge Burns's Instructions Forbid the Exercise of Grand Jury Discretion Established in Both Vasquez and Navarro-Vargas II.**

The Navarro-Vargas II majority found that the instruction in that case "leave[s] room for the grand jury to dismiss even if it finds probable cause," 408 F.3d at 1205, adopting the analysis in its previous decision in Marcucci.  Marcucci reasoned that the instructions do not mandate that grand jurors indict upon every finding of probable cause because the term "should" may mean "what is probable or expected." 299 F.3d at 1164 (citation omitted).  That reading of the term "should" makes no sense in context, as Judge

Hawkins ably pointed out.  See Navarro-Vargas II, 408 F.3d at 1210-11 (Hawkins, J., dissenting) ("The

instruction's use of the word 'should' is most likely to be understood as imposing an inflexible 'duty or

obligation' on grand jurors, and thus to circumscribe the grand jury's constitutional independence.").  See

also id. ("The 'word' should is used to express a duty [or] obligation.") (quoting The Oxford American

Diction and Language Guide 1579 (1999) (brackets in original)).

The debate about what the word "should" means is irrelevant here; the instructions here make no

such fine distinction.  The grand jury instructions make it painfully clear that grand jurors simply may not

choose not to indict in the event of what appears to them to be an unfair application of the law: should "you

disagree with that judgment made by Congress, then your option is not to say 'well, I'm going to vote against

indicting even though I think that the evidence is sufficient'...."  See Ex. A at 8-9.  Thus, the instruction

flatly bars the grand jury from declining to indict because they disagree with a proposed prosecution.  No

grand juror would read this language as instructing, or even allowing, him or her to assess "the need to

indict."  Vasquez, 474 U.S. at 264.

While Judge Burns used the word "should" instead of "shall" during voir dire with respect to whether

an indictment was required if probable cause existed, see Ex. B at 4, 8, in context, it is clear that Judge Burns

could only mean "should" in the obligatory sense.  For example, when addressing a prospective juror, Judge

Burns not only told the jurors that they "should" indict if there is probable cause, it told them that if there

is not probable cause, "then the grand jury should hesitate and not indict."  See id. at 8.  At least in context,

it would strain credulity to suggest that Judge Burns was using "should" for the purpose of "leaving room

for the grand jury to [indict] even if it finds [no] probable cause."  See Navarro-Vargas, 408 F.3d at 1205.

Clearly Judge Burns was not.

The full passage cited above effectively eliminates any possibility that Judge Burns intended the

Navarro-Vargas spin on the word "should."

> [T]he grand jury is determining really two factors: "do we have a reasonable belief that a
> crime was committed?  And second, do we have a reasonable belief that the person that they
> propose that we indict committed the crime?"
>
> If the answer is "yes" to both of those, then the case should move forward.  If the answer to
> either of the questions is "no," then the grand jury should not hesitate and not indict.

//

1   See Ex. B at 8.  Of the two sentences containing the word "should," the latter of the two essentially states

2   that if there is no probable cause, you *should* not indict.  Judge Burns could not possibly have intended to

3   "leav[e] room for the grand jury to [indict] even if it finds [no] probable cause."  See Navarro-Vargas, 408

4   F.3d at 1205 (citing Marcucci, 299 F.3d at 1159).  That would contravene the grand jury's historic role of

5   protecting the innocent.  See, e.g., United States v. Calandra, 414 U.S. 338, 343 (1974) (The grand jury's

6   "responsibilities continue to include both the determination whether there is probable cause and the

7   protection of citizens against unfounded criminal prosecutions.") (citation omitted).

8        By the same token, if Judge Burns said that "the case should move forward" if there is probable

9   cause, but intended to "leav[e] room for the grand jury to dismiss even if it finds probable cause," see

10  Navarro-Vargas, 408 F.3d at 1205 (citing Marcucci, 299 F.3d at 1159), then Judge Burns would have to have

11  intended two different meanings of the word "should" in the space of two consecutive sentences.  That could

12  not have been his intent.  But even if it were, no grand jury could ever have had that understanding.[8]  Jurors

13  are not presumed to be capable of sorting through internally contradictory instructions.  See generally United

14  States v. Lewis, 67 F.3d 225, 234 (9th Cir. 1995) ("where two instructions conflict, a reviewing court cannot

15  presume that the jury followed the correct one") (citation, internal quotations and brackets omitted).

16       Lest there be any room for ambiguity, on no less than four occasions, Judge Burns made it explicitly

17  clear to the grand jurors that "should" was not merely suggestive, but obligatory:

18       **(1)**     The first occasion occurred in the following exchange when Judge Burns conducted voir dire

19  and excused a potential juror (CSW):

20       The Court: . . . If there's probable cause, then the case should go forward.  I wouldn't want
         you to say, "Well, yeah, there's probable cause.  But I still don't like what the government
21       is doing.  I disagree with these laws, so I'm not going to vote for it to go forward."  If that's
         your frame of mind, then probably you shouldn't serve.  Only you can tell me that.
22       Prospective Juror: Well, I think I may fall in that category.
         The Court: In the latter category?
23       Prospective Juror: Yes.
         The Court: Where it would be difficult for you to support a charge even if  you thought the
24       evidence warranted it?

25

26

27   [8] This argument does not turn on Mr. Valenzuela-Galindo' view that the Navarro-Vargas/Marcucci
     reading of the word "should" in the model instructions is wildly implausible.  Rather, it turns on the context
     in which the word is employed by Judge Burns in his unique instructions, context which eliminates the
28   Navarro-Vargas/Marcucci reading as a possibility.

1  Prospective Juror: Yes.
2  The Court: I'm going to excuse you then

3  See Ex. B at 17. There was nothing ambiguous about the word "should" in this exchange with a prospective

4  juror. Even if the prospective juror did not like what the government was doing in a particular case, that case

5  "should go forward" and Judge Burns expressly disapproved of any vote that might prevent that. See id. ("I

6  wouldn't want you [to vote against such a case]"). The sanction for the possibility of independent judgment

7  was dismissal, a result that provided full deterrence of that juror's discretion and secondary deterrence as

8  to the exercise of discretion by any other prospective grand juror.

9       (**2**)     In an even more explicit example of what "should" meant, Judge Burns makes clear that it

10  there is an unbending obligation to indict if there is probable cause. Grand jurors have no other prerogative.

11  Court  . . . It's for me to say, "Well, I don't like it. So I'm not going to follow it here."

12       You'd have a similar *obligation* as a grand juror even though you might have to grit your
13       teeth on some cases. Philosophically, if you were a member of Congress, you'd vote against,
        for example, criminalizing marijuana. I don't know if that's it, but you'd vote against
14       criminalizing some drugs.

15       That's not what your *prerogative* is here. Your prerogative instead is act like a judge and to
        say, "All right. This is what I've got to deal with objectively. Does it seem to me that a
16       crime was committed? Yes. Does it seem to me that this person's involved? It does." *And
        then your obligation, if you find those things to be true, would be to vote in favor of the case
17       going forward*.

18  Id. at 26-27 (emphasis added). After telling this potential juror (REA) what his obligations and prerogatives

19  were, the Court inquired as to whether "you'd be inclined to let people go on drug cases even though you

20  were convinced there was probable cause they committed a drug offense?" Id. at 27. The potential juror

21  responded: "It would depend on the case." Id. Nevertheless, that juror was excused. Id. at 28. Again, in

22  this context, and contrary to the situation in Navarro-Vargas, "should" means "shall"; it is obligatory, and

23  the juror has no prerogative to do anything other than indict if there is probable cause.

24       Moreover, as this example demonstrates, the issue is not limited to whether the grand jury believes

25  a particular law to be "unwise." This juror said that any decision to indict would not depend on the law, but

26  rather it would "depend on the case." Thus, it is clear that Judge Burns's point was that if a juror could not

27  indict on probable cause for *every* case, then that juror was not fit for service. It is equally clear that the

28  prospective juror did not dispute the "wisdom of the law;" he was prepared to indict under some factual

1  scenarios, perhaps many.  But Judge Burns did not pursue the question of what factual scenarios troubled

2  the prospective jurors, because his message is that there is no discretion not to indict.

3      **(3)**      As if the preceding examples were not enough, Judge Burns continued to pound the point

4  home that "should" meant "shall" when it told another grand juror during voir dire: "[W]hat I have to insist

5  on is that you follow the law that's given to us by the United States Congress.  We enforce the federal laws

6  here."  See id. at 61.

7      **(4)**      And then again, after swearing in all the grand jurors who had already agreed to indict in

8  every case where there was probable cause, Judge Burns reiterated that "should" means "shall" when it

9  reminded them that "your option is not to say 'well, I'm going to vote against indicting even though I think

10  that the evidence is sufficient . . . . Instead your *obligation* is . . . not to bring your personal definition of

11  what the law ought to be and try to impose that through applying it in a grand jury setting."  See Ex. A at 9.

12      Moreover, Judge Burns advised the grand jurors that the were forbidden from considering the

13  penalties to which indicted persons may be subject.

14      Prospective Juror (REA): ... And as far as being fair, it kind of depends on what the case is
       about because there is a disparity between state and federal law.
15      The Court:  In what regard?
       Prospective Juror: Specifically, medical marijuana.
16      The Court:  Well, those things -- the consequences of your determination shouldn't concern
       you in the sense that penalties or punishment, things like that -- *we tell trial jurors, of course,*
17      *that they cannot consider the punishment or the consequence that Congress has set for these*
       *things.  We'd ask you to also abide by that.*  We want you to make a business-like decision
18      of whether there was a probable cause. ...

19  See Ex. B at 24-25 (emphasis added).  A "business-like decision of whether there was a probable cause"

20  would obviously leave no role for the consideration of penalty information.

21      The Ninth Circuit previously rejected a claim based upon the proscription against consideration of

22  penalty information based upon the same unlikely reading of the word "should" employed in Marcucci.  See

23  United States v. Cortez-Rivera, 454 F.3d 1038, 1040-41 (9th Cir. 2006).  Cortez-Rivera is inapposite for two

24  reasons.  First, Judge Burns did not use the term "should" in the passage quoted above.  Second, that context,

25  as well as his consistent use of a mandatory meaning in employing the term, eliminate the ambiguity (if there

26  ever was any) relied upon by Cortez-Rivera.  The instructions again violate Vasquez, which plainly

27  authorized consideration of penalty information.  See 474 U.S. at 263.

28  //

Noting can mask the undeniable fact that Judge Burns explicitly instructed the jurors time and time again that they had a duty, an obligation, and a singular prerogative to indict each and every case where there was probable cause. These instructions go far beyond the holding of <u>Navarro-Vargas</u> and stand in direct contradiction of the Supreme Court's decision in <u>Vasquez</u>. Indeed, it defies credulity to suggest that a grand juror hearing these instructions, and that voir dire, could possibly believe what the Supreme Court held in <u>Vasquez</u>:

> The grand jury does not determine only that probable cause exists to believe that a defendant committed a crime, or that it does not. In the hands of the grand jury lies the power to charge a greater offense or a lesser offense; numerous counts or a single count; and perhaps most significant of all, a capital offense or a non-capital offense – all on the basis of the same facts. Moreover, "[t]he grand jury is not bound to indict in every case where a conviction can be obtained."

474 U.S. at 263 (quoting <u>United States v. Ciambrone</u>, 601 F.2d 616, 629 (2nd Cir. 1979) (Friendly, J., dissenting)); <u>accord</u> <u>Campbell v. Louisiana</u>, 523 U.S. 392, 399 (1998) (The grand jury "controls not only the initial decision to indict, but also significant decisions such as how many counts to charge and whether to charge a greater or lesser offense, including the important decision whether to charge a capital crime."). Nor would the January 2007 grand jury ever believe that it was empowered to assess the "the need to indict." <u>See</u> <u>id.</u> at 264. Judge Burns's grand jury is not <u>Vasquez</u>'s grand jury. The instructions therefore represent structural constitutional error "that interferes with the grand jury's independence and the integrity of the grand jury proceeding." <u>See</u> <u>United States v. Isgro</u>, 974 F.2d 1091, 1094 (9th Cir. 1992). The indictment must therefore be dismissed. <u>Id.</u>

The <u>Navarro-Vargas II</u> majority's faith in the structure of the grand jury *is not* a cure for the instructions excesses. The <u>Navarro-Vargas II</u> majority attributes "[t]he grand jury's discretion -- its independence -- [to] the absolute secrecy of its deliberations and vote and the unreviewability of its decisions." 408 F.3d at 1200. As a result, the majority discounts the effect that a judge's instructions may have on a grand jury because "it is the *structure* of the grand jury process and its *function* that make it independent." <u>Id.</u> at 1202 (emphases in the original).

Judge Hawkins sharply criticized this approach. The majority, he explains, "believes that the 'structure' and 'function' of the grand jury -- particularly the secrecy of the proceedings and unreviewability of many of its decisions -- sufficiently protects that power." <u>See</u> <u>id.</u> at 1214 (Hawkins, J., dissenting). The

1  flaw in the majority's analysis is that "[i]nstructing a grand jury that it lacks power to do anything beyond

2  making a probable cause determination ... unconstitutionally undermines the very structural protections that

3  the majority believes save[] the instruction." Id. After all, it is an "'almost invariable assumption of the law

4  that jurors follow their instructions.'" Id. (quoting Richardson v. Marsh, 481 U.S. 200, 206 (1987)). If that

5  "invariable assumption" were to hold true, then the grand jurors could not possibly fulfill the role described

6  in Vasquez. Indeed, "there is something supremely cynical about saying that it is fine to give jurors

7  erroneous instructions because nothing will happen if they disobey them." Id.

8      In setting forth Judge Hawkins' views, Mr. Valenzuela-Galindo understands that Judge Burns may

9  not adopt them solely because the reasoning that supports them is so much more persuasive than the

10  majority's sophistry. Rather, he sets them forth to urge the Court *not to extend* what is already untenable

11  reasoning.

12      Here, again, the question is not an obscure interpretation of the word "should", especially in light

13  of the instructions and commentary by Judge Burns during voir dire discussed above - unaccounted for by

14  the Court in Navarro-Vargas II because they had not yet been disclosed to the defense, but an absolute ban

15  on the right to refuse to indict that directly conflicts with the recognition of that right in Vasquez, Campbell,

16  and both Navarro-Vargas II opinions. Navarro-Vargas II is distinguishable on that basis, but not only that.

17      Judge Burns did not limit itself to denying the grand jurors the power that Vasquez plainly states they

18  enjoy. He also excused prospective grand jurors who might have exercised that Fifth Amendment

19  prerogative, excusing "three [jurors] in this case, because they could not adhere to [that] principle...." See

20  Ex. A at 8; Ex. B at 17, 28. The structure of the grand jury and the secrecy of its deliberations cannot

21  embolden grand jurors who are no longer there, likely because they expressed their willingness to act as the

22  conscience of the community. See Navarro-Vargas II, 408 F.3d at 1210-11 (Hawkins, J., dissenting) (a

23  grand jury exercising its powers under Vasquez "serves ... to protect the accused from the other branches

24  of government by acting as the 'conscience of the community.'") (quoting Gaither v. United States, 413 F.2d

25  1061, 1066 &  n.6 (D.C. Cir. 1969)). The federal courts possess only "very limited" power "to fashion, on

26  their own initiative, rules of grand jury procedure," United States v. Williams, 504 U.S. 36, 50 (1992), and,

27  here, Judge Burns has both fashioned his own rules and enforced them.

28  //

1

**D.    The Instructions Conflict with Williams' Holding That There Is No Duty to Present
Exculpatory Evidence to the Grand Jury.**

2

3         In <u>Williams</u>, the defendant, although conceding that it was not required by the Fifth Amendment,

4    argued that the federal courts should exercise their supervisory power to order prosecutors to disclose

5    exculpatory evidence to grand jurors, or, perhaps, to find such disclosure required by Fifth Amendment

6    common law. <u>See</u> 504 U.S. at 45, 51. <u>Williams</u> held that "as a general matter at least, no such 'supervisory'

7    judicial authority exists." <u>See id.</u> at 47. Indeed, although the supervisory power may provide the authority

8    "to dismiss an indictment because of misconduct before the grand jury, at least where that misconduct

9    amounts to a violation of one of those 'few, clear rules which were carefully drafted and approved by Judge

10   Burns and by Congress to ensure the integrity of the grand jury's functions,'" <u>id.</u> at 46 (citation omitted),

11   it does not serve as "a means of *prescribing* such standards of prosecutorial conduct in the first instance."

12   <u>Id.</u> at 47 (emphasis added). The federal courts possess only "very limited" power "to fashion, on their own

13   initiative, rules of grand jury procedure." <u>Id.</u> at 50. As a consequence, <u>Williams</u> rejected the defendant's

14   claim, both as an exercise of supervisory power and as Fifth Amendment common law. <u>See id.</u> at 51-55.

15         Despite the holding in <u>Williams</u>, the instructions here assure the grand jurors that prosecutors would

16   present to them evidence that tended to undercut probable cause. <u>See</u> Ex. A at 20.

17         Now, again, this emphasizes the difference between the function of the grand jury and the
         trial jury. You're all about probable cause. If you think that there's evidence out there that
18       might cause you say "well, I don't think probable cause exists," then it's incumbent upon you
         to hear that evidence as well. As I told you, in most instances, *the U.S. Attorneys are duty-*
19       *bound to present evidence that cuts against what they may be asking you to do if they're*
         *aware of that evidence.*

20

21   <u>Id.</u> (emphasis added). Moreover, the district court later returned to the notion of the prosecutors and their

22   duties, advising the grand jurors that they "can expect that the U.S. Attorneys that will appear in from of

23   [them] will be candid, they'll be honest, and ... they'll act in good faith in all matters presented to you." <u>See</u>

24   <u>id.</u> at 27. The Ninth Circuit has already concluded it is likely this final comment is "unnecessary." <u>See</u>

25   <u>Navarro-Vargas</u>, 408 F.3d at 1207.

26         This particular instruction has a devastating effect on the grand jury's protective powers, particularly

27   if it is not true. It begins by emphasizing the message that <u>Navarro-Vargas II</u> somehow concluded was not

28   conveyed by the previous instruction: "You're all about probable cause." <u>See</u> Ex. A at 20. Thus, once again,

the grand jury is reminded that they are limited to probable cause determinations (a reminder that was probably unnecessary in light of the fact that Judge Burns had already told the grand jurors that they likely would be excused if they rejected this limitation). The instruction goes on to tell the grand jurors that they should consider evidence that undercuts probable cause, but also advises the grand jurors that the prosecutor will present it. The end result, then, is that grand jurors should consider evidence that goes against probable cause, but, if none is presented by the government, they can presume that there is none. After all, "in most instances, the U.S. Attorneys are duty-bound to present evidence that cuts against what they may be asking you to do if they're aware of that evidence." See id. Moreover, during voir dire, Judge Burns informed the jurors that "my experience is that the prosecutors don't play hide-the-ball. If there's something adverse or that cuts against the charge, you'll be informed of that. *They have a duty to do that*." See Ex. B at 14-15 (emphasis added). Thus, if the exculpatory evidence existed, it necessarily would have been presented by the "duty-bound" prosecutor, because the grand jurors "can expect that the U.S. Attorneys that will appear in from of [them] will be candid, they'll be honest, and ... they'll act in good faith in all matters presented to you." See Ex. A at 27.

These instructions create a presumption that, in cases where the prosecutor does not present exculpatory evidence, no exculpatory evidence exists. A grand juror's reasoning, in a case in which no exculpatory evidence was presented, would proceed along these lines:

(1)    I have to consider evidence that undercuts probable cause.
(2) The candid, honest, duty-bound prosecutor would, in good faith, have presented any such evidence to me, if it existed.
(3)    Because no such evidence was presented to me, I may conclude that there is none.

Even if some exculpatory evidence were presented, a grand juror would necessarily presume that the evidence presented represents the universe of all available exculpatory evidence; if there was more, the duty-bound prosecutor would have presented it.

The instructions, therefore, discourage investigation -- if exculpatory evidence were out there, the prosecutor would present it, so investigation is a waste of time -- and provide additional support to every probable cause determination: i.e., this case may be weak, but I know that there is nothing on the other side of the equation because it was not presented. A grand jury so badly misguided is no grand jury at all under the Fifth Amendment.

1

## III.

2

## MOTION FOR LEAVE TO FILE ADDITIONAL MOTIONS

3    *Defense counsel has received 52 pages of discovery in this case.*  As more information comes to

4    light, due to the Government providing additional discovery in response to these motions or an order of this

5    Court, the defense may find it necessary to file further motions.  It is, therefore, requested that defense

6    counsel be allowed the opportunity to file further motions based upon information gained through the

7    discovery process. **Specifically, defense counsel has not yet had an opportunity to examine Mr.**

8    **Valenzuela-Galindo' immigration A-file yet. After examining his A-file, Mr. Valenzuela-Galindo**

9    **anticipates he may file a motion to attack any alleged deportations. Mr. Valenzuela-Galindo thus**

10    **requests an opportunity to file further motions upon review of his A-file.**

11

## IV.

12

## CONCLUSION

13    For the foregoing reasons, Mr. Valenzuela-Galindo respectfully requests that the Court grant the

14    above motions.

15                                                    Respectfully submitted,

16

17    Dated: May 13, 2008                    */s/ Hanni M. Fakhoury*
                                             **HANNI M. FAKHOURY**
18                                           Federal Defenders of San Diego, Inc.
                                             Attorneys for Mr. Valenzuela-Galindo
19

20

21

22

23

24

25

26

27

28